IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAIRO GUSTAVO AGUILERA SAGASTIZADO<br>  a/k/a "Coy,"<br>  a/k/a "Maruchan,"<br>  a/k/a "Psicólogo,"<br><br>*Defendant.* | Criminal No. 1:21-CR-260<br><br>Count One: Conspiracy to Commit Murder in Aid of Racketeering (18 U.S.C. § 1959(a)(5))<br><br>Count Two: Murder in Aid of Racketeering Activity (18 U.S.C. §§ 1959(a)(1) and 2)<br><br>Count Three: Use and Discharge of a Firearm During and in Relation to a Crime of Violence Causing Death (18 U.S.C. §§ 924(c)(1)(A) and (j)(1) and 2)<br><br>Notice of Special Findings (18 U.S.C. §§ 3591 and 3592) |

INDICTMENT

November 2021 Term – at Alexandria

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

GENERAL ALLEGATIONS

1. *La Mara Salvatrucha*, also known as MS-13 ("MS-13"), was a gang composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating in the Commonwealth of Virginia, including in Prince William County, Fairfax County, Alexandria, Richmond, and throughout the United States.

1

2.  In the United States, MS-13 has been functioning since at least the 1980s. MS-13 originated in Los Angeles, California, where MS-13 members banded together for protection against the larger Mexican groups. MS-13 quickly spread to states across the country, including Virginia.

3.  MS-13 was a national and international criminal organization and was one of the largest street gangs in the United States. Gang members actively recruited members, including juveniles, from communities with a large number of Salvadoran immigrants.

4.  Members of MS-13 from time to time signified their membership by wearing tattoos reading "MARA SALVATRUCHA," "MS," "MS-13," or similar tattoos, often written in gothic lettering. Members also signified their membership through tattoos of devil horns in various places on their bodies. Members sometimes avoided conspicuous MS-13 tattoos, instead wearing discreet ones such as "503," spider webs, three dots in a triangle formation signifying "mi vida loca," or clown faces with phrases such as "laugh now, cry later." Some MS-13 members have chosen not to have tattoos at all, or to have them placed on areas such as the hairline where they can be easily covered, in order to conceal their gang affiliation from law enforcement.

5.  The gang colors of MS-13 were blue, black, and white, and members often wore clothing, particularly sports jerseys, with the number "13," or with numbers that, when added together, totaled 13, such as "76." MS-13 members also wore blue and white clothing to represent their membership, including blue and white shoes such as the Nike "Cortez." As with tattoos, some MS-13 members selected more discreet ways of dressing in order to signify their membership and at the same time avoid detection by law enforcement.

6.  MS-13 members referred to one another by their gang names, or monikers, and often did not know fellow gang members except by their gang names.

7. Members of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 members required that all individuals show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary to force respect from those who showed disrespect, including acts of intimidation and violence.

8. Members and associates of MS-13 frequently engaged in criminal activity, including, but not limited to, murder and drug trafficking, as well as attempts and conspiracies to commit such offenses. MS-13 members and associates were required to commit acts of violence, including against rival gang members in order to gain entrance to, and maintain membership and discipline within the gang. Participation in criminal activity by a member or associate, particularly in violent acts directed at rival gangs or as directed by gang leadership, increased the respect accorded to that member or associate, resulted in that member or associate maintaining or increasing his position in the gang, and opened the door to a promotion to a leadership position. One of the principal rules of MS-13 was that its members and associates must attack and kill rivals whenever possible. Rivals were often referred to as "chavalas." MS-13, in the area of Prince William County, maintained rivalries with, among others, the 18th Street Gang.

9. Prospective members who sought to join MS-13 were required to complete an initiation process. Individuals who associated and committed crimes with the gang were called "paisas," "paros," "esquinas," or "observaciones." Individuals who were attempting to join the gang were called "chequeos," or "cheqs." Chequeos underwent a probationary period during which they were required to commit crimes on behalf of MS-13 to achieve trust and prove their loyalty to the gang. To join MS-13 and become full members or "homeboys," prospective members were required to complete an initiation process, often referred to as being "jumped in"

or "beat in" to the gang. During that initiation, other members of MS-13 would beat the new member, usually until a gang member finished counting aloud to the number thirteen, representing the "13" in MS-13.

10. Within MS-13, the primary unit of organization was known as a "clique," that is, smaller groups operating in a specific city or region. Cliques operated under the umbrella rules of MS-13. MS-13 cliques often worked together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In Virginia and the surrounding area, these cliques included, among others, the Sitios Locos Salvatrucha ("STLS" or "Sitios"), Pinos Locos Salvatrucha ("PLS" or "Pinos"), Herndon City Locos Salvatrucha ("HCLS"), Normandie Locos Salvatrucha ("NLS" or "Normandie"), Sailors Locos Salvatrucha Westside ("SLSW" or "Sailors"), Fulton Locos Salvatrucha ("FLS" or "Fulton"), Parkview Locos Salvatrucha ("PVLS"), Uniones Locos Salvatrucha ("ULS"), and Gangster Locos Salvatrucha ("GLS" or "Gangsters").

11. The defendant, **JAIRO GUSTAVO AGUILERA SAGASTIZADO, a/k/a "Coy," a/k/a "Maruchan," a/k/a "Psicólogo,"** was a member and associate of the STLS/Sitios clique of MS-13.

12. Each clique was presided over by the "First Word," the leader or president of the clique. The leader was also sometimes referred to as "Primera Palabra" or "Corredor." The "Second Word," or "Segundo Palabra," was the second-in-command of the clique. General members were required to take orders from the First Word and Second Word.

13. MS-13 cliques kept in contact and reported to the leaders for their respective cliques, who were oftentimes based in various states or in El Salvador. Cliques contacted their leaders based in other states or El Salvador using cellular telephones during clique meetings to keep them updated on gang business, for advice, and to resolve disagreements regarding operations

4

among local cliques. Incarcerated clique leaders based in El Salvador regularly communicated and directed orders to Virginia-based cliques through phones smuggled into Salvadoran prisons.

14. MS-13 members met on a regular basis to, among other things, discuss gang affairs and report on acts of violence committed by their members, with the goal of inciting and encouraging further violence. Each clique held clique meetings where business specific to that clique was discussed. Any perceived indiscretions by members or violations of MS-13 rules were talked about at clique meetings and punishments or "violations" were issued. Violations often took the form of beatings by fellow MS-13 members. More serious violations resulted in the issuance of a "greenlight." A greenlight was an order and/or approval to kill.

15. MS-13 leaders from various cliques also held regional meetings to discuss issues between cliques and discuss criminal ventures among the cliques. Clique leaders from across the United States, from other countries, and within regions of the United States would meet or communicate by telephone conference to discuss gang rules and gang business, to resolve problems or issues among cliques and gang members of different cliques, and to unite gang members from across the country.

16. MS-13 received money and income from sources including member dues and the extortion or "taxing" of brothels and other illegitimate businesses, as well as narcotics trafficking and the commission of robberies. Such funds were used for gang purposes, including obtaining weapons and providing support for MS-13 gang members who were imprisoned in the United States, both inside and outside of Virginia, and in El Salvador.

17. MS-13 members communicated about gang activities with other MS-13 members in Virginia and elsewhere using mobile telephones, telephone text messages, social media such as Facebook and e-mail accounts, and other modes of communication. Additionally, MS-13

members used national and international money wire transfers to conduct and promote gang activities.

<u>The Racketeering Enterprise</u>

18. At all times relevant to this Indictment, MS-13, including its leadership, membership, and associates, constituted an enterprise as defined in 18 U.S.C. §1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce ("the MS-13 Enterprise" or "the Enterprise"). The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. At all times relevant to this Indictment, MS-13 operated in the Eastern District of Virginia and elsewhere.

<u>Purposes of the Enterprise</u>

19. The purposes of the MS-13 Enterprise included, but were not limited to:

    a. Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, threats of violence, and violence, including assaults and murder;

    b. Promoting and enhancing the enterprise and its leaders', members', and associates' activities, including, but not limited to, murder, drug trafficking, and other criminal activities;

    c. Keeping victims, potential victims, and community members in fear of the enterprise through violence and threats of violence;

    d. Providing financial support and information to gang leaders, members, and associates, including individuals incarcerated in the United States and in El Salvador;

    e. Providing assistance to gang leaders, members, and associates who committed crimes on behalf of the enterprise; and

f. Hindering, obstructing, and preventing law enforcement officers from identifying participants in the enterprise's criminal activity; from apprehending the perpetrators of those crimes; and from successfully prosecuting and punishing the offenders.

<u>Means and Methods of the Enterprise</u>

20. Among the means and methods by which the members and associates of the MS-13 Enterprise conducted and participated in the conduct of the affairs of the Enterprise were the following:

a. The members and associates of MS-13 used intimidation, threats of violence, and violence, including assaults and murder, to preserve, expand, and protect MS-13's territory and activities, to promote and enhance its prestige, reputation, and position in the community, and to discipline gang members who had been disloyal or had violated gang rules;

b. The members and associates of MS-13 attended regular gang meetings and communicated with other MS-13 members to discuss, among other things: the structure and organization of the gang; past criminal acts committed against rival gang members and others; MS-13 leaders, members, and associates who had been arrested or incarcerated; disciplining MS-13 leaders, members, and associates who had violated gang rules; police interactions with MS-13 leaders, members, and associates; the identities of individuals suspected of cooperating with law enforcement, and proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, as well as ways to conceal these crimes;

c. The members and associates of MS-13 also communicated with other MS-13 members in Virginia and elsewhere, and represented their gang allegiance, through social media such as Facebook, including by posting photographs of themselves with other gang members, showing gang hand signs, wearing colors or clothing associated with MS-13, and posing

7

with weapons or gang-related graffiti, and by sending and/or posting messages referencing their affiliation with MS-13;

        d.      The members and associates of MS-13 financed the enterprise through a variety of activities, including the extortion of money – sometimes referred to as "rent" – from legitimate and illegitimate businesses operating on the gang's turf, as well as through the commission of robberies.

        e.      The members and associates of MS-13 distributed and agreed to distribute or assist distribution of controlled substances on behalf of the gang;

        f.      The funds raised by the gang were used for gang purposes, including obtaining weapons and providing support for MS-13 gang members, including those imprisoned in the United States, inside and outside of Virginia, and in El Salvador;

        g.      The members and associates of MS-13 hindered and obstructed the efforts of law enforcement to identify, apprehend, and successfully prosecute and punish gang members;

        h.      The members and associates of MS-13 would investigate rival gang members or other persons targeted for violence; would obtain information about such targets, including locations frequented by them; and would use such information in their plans to attack such targets; and

        i.      The members and associates of MS-13 would and did agree that acts involving murder, including conspiracy and attempts to commit murder, and other acts of violence, would be committed by members and associates of MS-13 against rival gang members and persons deemed as threats to MS-13 and for the purpose of imposing discipline within the gang, and on other occasions as deemed necessary.

21. MS-13, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is:

    a. Acts involving murder, chargeable under Virginia Code §§ 18.2-32, 18.2-26, 18.2-22, and 18.2-18; and

    b. Offenses involving drug trafficking, in violation of 21 U.S.C. §§ 841 and 846.

## Count One

*(Conspiracy to Commit Murder in Aid of Racketeering Activity)*

THE GRAND JURY CHARGES THAT:

The GENERAL ALLEGATIONS of this Indictment are realleged and incorporated by reference as though fully set forth herein.

In and around September 2019, within the Eastern District of Virginia and elsewhere, the defendant, **JAIRO GUSTAVO AGUILERA SAGASTIZADO, a/k/a "Coy," a/k/a "Maruchan," a/k/a "Psicólogo,"** for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did knowingly combine, conspire, confederate, and agree, with others known and unknown to the grand jury, to murder A.K.S., in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code §§ 18.2-22 and 18.2-32.

(In violation of Title 18, United States Code, Section 1959(a)(5).)

## Count Two

*(Murder in Aid of Racketeering Activity)*

THE GRAND JURY FURTHER CHARGES THAT:

The GENERAL ALLEGATIONS of this Indictment are realleged and incorporated by reference as though fully set forth herein.

On or about September 24, 2019, in Prince William County, Virginia, within the Eastern District of Virginia, the defendant, **JAIRO GUSTAVO AGUILERA SAGASTIZADO, a/k/a "Coy," a/k/a "Maruchan," a/k/a "Psicólogo,"** and others known and unknown to the grand jury, for the purpose of gaining entrance to and maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, did murder A.K.S., in violation of the laws of the Commonwealth of Virginia, specifically, Va. Code §§ 18.2-32 and 18.2-18, and did aid, abet, counsel, command, induce, and cause another to commit said offense.

(In violation of Title 18, United States Code, Sections 1959(a)(1) and 2.)

## Count Three

*(Using, Brandishing, and Discharging a Firearm During a Crime of Violence Causing Death)*

THE GRAND JURY FURTHER CHARGES THAT:

The GENERAL ALLEGATIONS of this Indictment are realleged and incorporated by reference as though fully set forth herein.

On or about September 24, 2019, in Prince William County, Virginia, within the Eastern District of Virginia, the defendant, **JAIRO GUSTAVO AGUILERA SAGASTIZADO, a/k/a "Coy," a/k/a "Maruchan," a/k/a "Psicólogo,"** and others known and unknown to the grand jury, did knowingly and intentionally use, carry, brandish, and discharge a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, namely, the murder of A.K.S. in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1), as set forth and charged in Count Two of this Indictment, and in the course of committing said offense, did cause the death of A.K.S. through the use of a firearm, which killing was murder, as defined in 18 U.S.C. § 1111, and did aid, abet, counsel, command, induce, and cause another to commit said offense.

(In violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii), (j)(1), and 2.)

## NOTICE OF SPECIAL FINDINGS CONCERNING SENTENCING ALLEGATIONS AS TO COUNTS TWO AND THREE

### 18 U.S.C. §§ 1959(a)(1) and 924(j)(1)

THE GRAND JURY FURTHER FINDS:

Pursuant to the provisions of 18 U.S.C. §§ 3591 through 3592, the following factors exist regarding defendant **JAIRO GUSTAVO AGUILERA SAGASTIZADO's, a/k/a "Coy," a/k/a "Maruchan," a/k/a "Psicólogo,"** commission of the offenses charged in Counts Two and Three, the allegations of which are hereby re-alleged as if set forth herein and incorporated by reference.

The defendant, **JAIRO GUSTAVO AGUILERA SAGASTIZADO, a/k/a "Coy," a/k/a "Maruchan," a/k/a "Psicólogo"**:

a. was more than 18 years old at the time of the offense (Title 18, United States Code, Section 3591(a));

b. intentionally killed A.K.S. (Title 18, United States Code, Section 3591(a)(2)(A));

c. intentionally inflicted serious bodily injury that resulted in the death of A.K.S. (Title 18, United States Code, Section 3591(a)(2)(B));

d. intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and A.K.S. died as a direct result of the act (Title 18, United States Code, Section 3591(a)(2)(C));

e. intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and A.K.S. died as a result of the act (Title 18, United States Code, Section 3591(a)(2)(D)); and

f.  committed the offense after substantial planning and premeditation to cause the death of A.K.S. (Title 18, United States Code, Section 3592(c)(9)).

A TRUE BILL

*Pursuant to the E-Government Act, The original of this page has been filed under seal in the Clerk's Office*

FOREPERSON

Jessica D. Aber,
United States Attorney

By: *[signature]*
John C. Blanchard
Assistant United States Attorney

Rachel R. Roberts
Special Assistant United States Attorney

Matthew K. Hoff
Department of Justice Trial Attorney

14